210-763 Musa Azemi v. Yachts May I please have the floor? As a brief background, let's just run this case as currently a 62-year-old. At the time of his injuries, he was approximately 55 years old. He was an immigrant from Macedonia. He came here in 1975. The only two jobs that he has done since coming to the United States is as a cook, and he worked for two years at New York's distribution center. The respondent in this case is a forklift driver. And not to throw you off your stride here, but there is a threshold issue, isn't there? Isn't there a cross-appeal by the employer on whether or not the court ever had jurisdiction in circuit court? There is, Your Honor, and I was going to allow my opponent to address that in his argument. And then respond to it? Sure. Correct. The petitioner testified that he did speak some English. He did testify in English at hearings. However, at home, he speaks solely Albanian and did not read or write in English for the most part. He suffered two injuries in December of 2003 and December of 2004, involving multiple body parts, neck, back, left knee. And the primary injury for my argument today is the right upper extremity. He had two surgeries at the time. The medical evidence is not in dispute, so I'm going to jump straight to the permanent restrictions, which are enclosed by the Castle Orthopedics. No climbing ladders, no lifting using the right shoulder, no repetitive work with the right arm, no squatting or kneeling, no bending or twisting. Again, the argument is that he was not able to perform. The petitioner reduced that to 75 million. The first point that I want to bring up are the restrictions by Dr. Bazar, who is for science, independent medical examiner. I'm not going to stand up here and argue my viability. I understand that that's a moving argument.  However, what the commission ignored is that Dr. Bazar refers to Castle Orthopedics' restrictions with respect to the right arm. Bazar says he can do sedentary work, but I defer to Castle with respect to the right arm because he cannot evaluate the petitioner for the right arm. And again, what Castle Orthopedics encloses on the right arm, no repetitive work and no lifting with the right shoulder at all. But is there not sedentary work that doesn't require that action? Your Honor, I believe that if you review the testimony of Mr. Harris, who was the respondent's witness as to the five jobs that they were potentially going to offer him at some time, that all of those jobs either involved repetitive work with the right arm or some type of advanced knowledge of the English language and ability to communicate with others, such as in medicine. Well, your own bulk expert says there's three types of sedentary work. Correct. And he eliminated two of them because he bought into the limited education of your client based on his testimony but never tested him for that. Is that correct? Correct. Well, I would submit, Your Honor, that he eliminated all three types of the sedentary work. The therapists and service he eliminated because of the English language skills and lack of education and inability to write. The manufacturing, which was the third type of sedentary work, he said that he can't do because of the physical limitations, not just with the upper, but also with the back and the neck. Wait a second. Isn't one of the positions that the bulk expert identified was the wood sorter control panel operator position, which merely required him to push a button with either hand? He's pushing a button. Well, what's the problem with that? And there was testimony, Your Honor, that the button would have to be pushed thousands of times per shift. And he can't do that? With a good hand? According to the only vocational evidence that has been provided to you, which is Edward Pichella, no, he cannot. And, Your Honor, that point leads into my next point, which is, is pushing a button for an entire shift really gainful employment? Respondent probably provided testimony that they will accommodate any type of restriction. Menard's Distribution can find a job for anyone. Is that gainful employment? How do you define gainful employment, or how has it been defined, either statutorily or case law? I believe that that would be a job that is available in the stable labor market, a job that, if Menard's Distribution could not close down, that Mr. Azemi could then go out and find a job pushing buttons for his entire shift. And I would submit to you that that's not a viable occupation. And I believe that's where the commission erred. They focused in on this word sedentary because Lazar mentioned it. They did not consider the right upper extremity. And because there was this vague generalized testimony that there are five jobs that could potentially be available for Menard's, that he's there for employment. Can I ask you a question? Where did Mr. Pagela get the notion that this man couldn't read and write English or couldn't, was limited in English? He's used to English. Where did he get that idea? He testified today. Who did? The petitioner himself. How did he get the job as a forklift driver? What did he have to do to get it? There was some evidence that there was testing that was done. In English? Correct. And he had to pass the test in order to get the job? Yes, but there was no evidence as to whether that test was translated for him or how he actually took that test. And also, Your Honor, there was evidence that his daughter actually filled out his employment application for him because he could not read or write English. He had to fill that out. Well, Harris countered that testimony and said what he did as a forklift operator was a computer where he had to enter in data and that he did that. And that it was his opinion that he was able to communicate in English and do his job. Correct, Your Honor, but there's no evidence. No one disputes the fact that he can't go back to being a forklift driver. That's why the commission awarded 75 of a man. Well, that's clear. We're just really talking about whether or not there's a stable labor market for sedentary employment given his condition right now. And he did testify in English, did he not? Correct. Okay. However, again, the only vocational evidence presented here from Edward Pagella took into account his limited English skills. No, no, no. What it took into account was Mr. Pagella believed his story. And there is no other evidence in the record to support that. Harris turns around, as Justice Holdren suggests, and says this man took a test in English. He had to input things into a computer. He couldn't do this if he couldn't read or write English. So you've attacked the very basis of Pagella's opinion. And second of all, can I ask you a question? Where does Dr. Eilers get the expertise to testify that this man can't return to a competitive labor market because of his limited education and age? Is he a rehabilitation expert? He's not. He's a medical doctor. Whose general expertise is how much it costs to take care of people after they've been injured. Is it not? Well, he's a physical medicine specialist. And he did review all the other medical records and gave his opinion. Did he testify that this man was a permanent total based on medical? He did, and he's the only doctor that says that. So we're not hanging our head on that. We're really focusing more on the online territory. So he has no expertise in the area of online, does he? Well, Your Honor, he's a medical doctor who reviewed the evidence. I can't opine as to whether he specifically had any training with respect to an ad lib total firm. But the expert testimony I would request the Court focus on is Mr. Pagella. Don't we have really a problem that maybe the Commission doesn't find the claimant very credible? He's given three different levels of education that he has attained in his lifetime. Well, the Commission does not specifically state that in their one paragraph decision. They focus on the word sedentary and the testimony of Harris stating X, Y, Z jobs could potentially be available at some point. There's no evidence that he could do any of these jobs, that any of these jobs were offered to him, or that any of these jobs would be available to him. And even if Your Honor do feel that one of these jobs would be available to him, there's still the out-of-lock finding based on the evidence of Edward Pagella. And that evidence shifts the burden to Respondent to then show the Court that Mr. Zunni is employable. And they have not met that burden. So you think the burden did shift? The burden did shift to Respondent. Because? Because Petitioner provided a vocational testimony of Edward Pagella stating that he is an out-of-lock total fund. And that's if the Commission finds Pagella to be a competent and credible vocational expert. Correct. But they did not state in their decision that he's not. Okay. Arguably this is a very scanty decision by the Commission in that you must look to the record to see what are reasonable inferences for the Commission to come up with a decision that did. Would it not be a reasonable inference if they, given the decision that they came up with, that they didn't find Pagella to be competent or credible as to this particular claimant, just because of the variation of his educational claims? I believe that the Commission misinterpreted the restrictions of Dr. LaVar. And I don't even think that they get to the point of judging the credibility of Mr. Pagella because they focus on Edward's pedantry and ignore these other right-arm restrictions. And again, the evidence presented by Respondent does not satisfy their burden that was shifted to them. Do they presuppose it ever shifted? You're presupposing. You're assuming that the burden shifted. Correct. One could view this record and say it never shifted at all. Well, I believe that based on the testimony of Mr. Pagella and his review of the records and his ‑‑ I think, and I agree, this is a very, very short decision by the Commission. But the fact of the matter is I think what it reeks from is the fact that they don't believe Pagella. They just don't believe him. Or if they don't, they could reasonably infer that Pagella's conclusions are based upon an inadequate foundation, that this variation in the educational attainment of the claimant, the fact he testifies in English, Harris's testimony about what he saw in him, what his communication abilities were, and the fact that there are three levels, three categories of sedentary work, and two of those are based upon not his right arm restrictions but on his educational limitations. Correct. It's undisputed, Your Honor, that there is a significant barrier because of the language. Being able to testify and speak English, you know, obviously by testifying he was able to do that. But it really comes down to the reading and writing. Some of the jobs that were proposed were clerical or customer service oriented, data entry oriented, which I would submit data entry involves both the right dominant arm in addition to an inability to understand and read and write the English language. So I see that your focus is on his ability to communicate with the English language, and I would submit that the arbitrator who saw him testify might be in the best position. I know that Your Honor did not comment on her decision, but she actually saw him testify and could be able to, you know, maybe in the best position to speak about his abilities. So you're saying those first two categories of service or clerical and service do require the ability to use the right arm? Specifically with respect to the jobs proposed by respondent. One, because the data entry job would involve computer work, which would require him to be typing, which would require the right upper extremity to be extended. And what exactly are his restrictions on the right arm? No repetitive use of the right arm and no lifting at all of the right arm. And you would say service would have a similar physical limitation. Correct. Or be subject to it. Correct. And then the manufacturing, as Mr. Pagella talks about, is more physical in nature, which is restricted not just by the right arm, but also the no bending, kneeling, squatting, finding out front of the knee and having back injuries there also. But this one position that Menard's has available would not require the right arm, you see. Correct. Are you suggesting the wood position, Your Honor? Yes. I still believe that that would involve the right upper extremity. And based on the number of times that it was testified that he would potentially have to do that, I still believe that that would exceed the restrictions. And again, Your Honor, even if he... Well, how would that... If it can be done with the non-dominant arm, how does it exceed the restrictions of the right arm? Assuming that he can do that job with just one arm. And even if you think he does, Your Honor, then I would again submit this issue of a sham job. Is this a job that he's going to be able to go out and find something where he can only use his left arm and be able to find a job with his limited English reading and writing skills in addition to his... So the standard is not that there is a job out there, but that there are a lot of jobs out there. Absolutely. In a stable labor market that is... Not that Menards creates this program. And I believe that if this panel affirms the commission's decision, it's going to send a message to respondents that, hey, accommodate anyone's restrictions and you'll avoid an outlaw at any cost. Counselor, your time is up. You'll have time. Time on the button. Counsel, please. Thank you, Your Honor. May it please the Court. I'm William Menards. Today in this room I present the cards of an affidavit in the case involving a request to reverse the trial judge's order and also I am to respect the athlete in the case that the petitioner has filed asking you to reverse the commission's decision. With respect to the first one, I don't want to spend so much time on that. I thought about it quite a bit about it, and I remember that when I first began practicing workers' compensation law, I remember that my mentors had told me to beware of Section 19-F, that it's full of lying things, and it is. And I remember reading the case law that came out of 19-F going back 30, 40, 60 years, and it seemed at that time, and sometimes it seems now, that you're wrong. But that's the law as it was then, and that's the law as it is now. And in this particular case, the documents were not filed on time. Well, is that really – and therein lies the problem. When you say filed, do you mean stamped, or do you mean received in the clerk's office? Because they're not necessarily the same. Well, you know, I'm glad you brought that up. It's an interesting point, because we do have one case among that I've cited, the Jones case, where there was the report on substantial compliance. In that particular case, the clerk was able to confirm that the commission had been paid the amount of money it was entitled to for the cost of appropriations and transfer. The document was not – the commission did not have that document. I'm sorry. The clerk did not have that document at the time that it had all the other documents. The clerk called the commission within the period of time. The clerk confirmed it, and then the clerk accepted it. And the court said that's how it happened, that there was substantial compliance. That didn't exist in this case with the testimony and the affidavit of Deputy Clerk Bruce? You know, that's the thing. When you take a look at that affidavit and you take a look at her testimony, it is equivocal. She's not going to say, well, yeah, it might have been there. I think it might have been there. She testified it arrived in the clerk's office before May 5th. I think that's fair. It's exactly what you testified. It arrived in the clerk's office before May 5th. And if that's what this court accepts and believes, then I believe then you have to follow the general state's standard of law. Well, I mean, it would stand or fall in the testimony because I think you'd have to concede. If it arrived there and got misplaced, your position couldn't be that the file stamp is the only thing they could possibly control. I mean, theoretically, you could have four witnesses testifying it was there on May 4th. It got lost, and you're going to come in and say, sorry, the file stamp says May 5th. You lose. I thought that the testimony, Your Honor, was a bit equivocal as to whether or not, you know, I think the clerk felt that, and I think the clerk was, I don't think the clerk said this was there on the court. I don't believe that they said that. I don't think she actually said it with that kind of certainty. And that's the thing about Section 19F, and that's what the line of basis requires. They require certainty. Why wouldn't the mailbox rule apply to the filing of a petition for review? You know, another good question. Well, the notice of appeal in the appellate court's jurisdictional, just like it has to be filed on time, the Supreme Court has said the mailbox rule applies to the filing of a notice of appeal in the appellate court Harrisburg-Raleigh Airport case. Why wouldn't it apply to this jurisdictional issue? Well, I agree that the mailbox rule applies in probably the vast majority of filing situations. Thank you. I'm grateful for that. But in this particular case, the mailbox rule does not apply. I think that some of the cases even point that out, that placing it into the mail is not enough. I know that using Federal Express is a no-no as opposed to using the U.S. Postal Service. But I know that there are case laws that say we mail it on time, but that's still a must. Well, it says commence by filing, right? So now we've got the definition. That's an interesting point. And perhaps this is the case that people deal with, because I believe as you pointed out in the briefs, that the term commence is not applied with respect to Section 19-F. And I think that perhaps that's what you're dealing with. As I said, I don't want to spend all of this time on it. I mean, this is something that every workers' compensation lawyer is famed. And so, which is the fact that the commission did not reverse the arbitrator. The commission modified it. And I think the most important thing to look at in the commission's decision, which you all pointed out, is somewhat brief. And I think it's brief for that purpose, the reason I just said. It was modified. It wasn't reversed. The commission basically said that they found the petitioner did not sustain his burden of proof on proving he was an iPod firm at all, because from the outset, he adamantly refused to accept employment. I think if we go beyond that and say, well, he could have done this or he could have done that, we're getting beyond the point where the commission was. The petitioner, we know, the petitioner was capable of performing some sort of sedentary work. And that's been the record. Apparently, that's not disputed. But her position is, or her response to that is, look, you're right. Technically, they found this one wood-sorter position. But she says they created one specific position, and that's a sham position, simply to avoid the payments. What's your response to that? Well, see, we've got about 900 jobs at that facility. And if we try to deal with drinking bad and then perhaps terrorism, and if that didn't work, then perhaps vocational rehabilitation would be the next step. But we never got to that point. He did not allow us to get to that point, because he wanted to engineer a firm called Will Disability. What he did was, is rather than make an effort to go back to work and say, well, I'm going to try something, he stood by it. He applied for Social Security. And remember, he told Social Security he had a fourth-grade education. And then he told Mr. Pagel he had an eighth-grade education. But he told us, the Menards, when he filled out his application for employment, that he graduated from high school in DeVros, Macedonia. Now, what's interesting about that is that the person who was the head of human resources at the time was his supervisor when he was working as a corporate contractor. And, you know, of course, at Menards, the work he was doing was making sure that product, whether it be a hammer or whatever, comes in one door and then goes out another door. But the other door goes out to either go to a store in Ohio, Michigan, or Wisconsin. And if you can't read and write English, then that hammer is not going to get to the right store. And as Mr. Harris said, and Mr. Berger said as well, they would have figured that out in a few days. This guy can't write English. And he did a darn good job for two years before this accident. So he was a capable person. And that is what the commission found, that he was capable of doing something. But he adamantly refused it. And that's as far as we have to go in this case. Because that, because... Well, is the standard capable of doing something under ODLOC, or is it, as the opposing counsel suggests, a stable work force, gainful employment? Well, Your Honor, I agree with your counsel that there has to be a stable labor market. And that's where we were going to study this case. Because we didn't get that. We offered him a job. And we said, well, you come on back to work. And as I indicated, we've got 900 jobs out there, you know, from the heaviest labor to the most sedentary. So come on out. Let's see what you can do. And we'll try you on this. And we knew he had experience. We knew that he had the experience to ship the product. And so, you know, we can do a lot of things. But we never got that chance. He never came forward. And instead, he made an application to Social Security. They hired him for the job. And they tried him on a total without sustaining the burden of approval. When was the fire done at September 4th in the Maritime Basin? No, it was in September 06. It's TTD expired. I'm sorry? When did his TTD expire? September 06? I don't know. I would be guessing. Oh. So there was a time gap there. Right? And you're saying that's when you were making these offers to come back to work. Oh, we were trying to bring him back. Yeah. We were going to see. And then what occurred, I don't recall exactly what it was. But, remember, we had the other issue of whether he had CRPS in the legs or whether it was rupture of the rock in the feet that was caused by his IED. So that was an issue that came up later. Those were the issues that basically got the desire to have him get addressed. But in terms of the fact that he was willing to return to work, the commission found that the leg problem is not caused by the leg. But it goes back to the shoulder injury and whether or not he could return to work within some sort of restriction. So I think here that the evidence that the commission considered in determining that this petition did not sustain his burden to show that he was not on the phone, I think there's more than overwhelming evidence in this record to support that decision. And I ask that you allow the commission to see it. Thank you. I'd like to briefly address the issue of the job offer. Counsel just stated before you that he adamantly refused to work. And let's focus on the timing of the job offer. Mr. Azami was kept off work by his treating team doctor, Dr. Goodman, at the time that this offer of work was made. That is why he did not return to work. That was prior to the most recent 19B decision, which addressed the left leg incident. After that decision came back stating that the complex renal pain syndrome was not related, there was no other offer of work, which at that time the restrictions would have been permanently in place. Let's also look at this offer of work. There's a generalized letter stating we have sedentary work for you. It does not specifically say we have the wood job available for you. It says we have general sedentary work. So there is, again, no evidence that these jobs were even available to him at the time that he was allegedly offered this work. And counsel just said it himself. We would have tailored a job for him. That is not something that he could go out and find a job in the state labor market. That is exactly what I'm arguing before you, that these jobs are created to avoid an outlook. And you can tell someone, I'll employ you, I'll give you a paycheck, come in and stare at the wall for an eight-hour shift. That is not uniform employment. This is a man with significant restrictions. He has significant restrictions outside of his injuries with respect to his English language skills, which there is evidence of in the record. And I do not want this court to send a message to respondents that they can take any individual person back to avoid an outlook simply by tailoring a program or creating a light-duty program without some evidence by a vocational counselor that these are appropriate jobs, that these are jobs within his restrictions, and that these are jobs that are available to him. But the employer doesn't have to get there until the burden shifts. And I would again submit, Your Honor, that with the vocational evidence of Edward Cogella, that Petitioner's burden has been met. We have provided evidence that he is not employable. And at that point, it becomes respondents' responsibility to show you that he is employable. And generalized testimony from an eight-hour individual with respect to some jobs that could potentially be available is not satisfied at birth. And I urge the court to consider that this program is a sham job and that the ad hoc should be reinstated. Quickly, with respect to the final issue, I believe that Your Honor reiterated the point that I was going to make. The testimony of Ms. Krause from the clerk's office, I believe, is the crux of my argument. She does specifically state on page 15 of her deposition that the documents were received prior to May 5th. You know, Petitioner, once we send those off, we cannot physically put the stamp in hand and have them stamp it. We complied with the rule. We have full compliance, not just substantial compliance. I believe that the motion to dismiss on that issue should be adjourned. Thank you. Thank you, counsel. The court will take the matter under advisement for disposition. We'll stand in recess for a short period.